IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LARRY SALDANA | } | |
| | } | |
| Plaintiff | ) | |
| | } | |
| vs. | } | CIVIL ACTION NO. H-04-0753 |
| | } | |
| E.I. DU PONT DE NEMOURS AND COMPANY, *et* al., | } } | |
| | } | |
| Defendants | ) | |

## MEMORANDUM AND ORDER

Pending before the Court is a motion for summary judgment brought by the Defendant, E I Du Pont De Nemours and Company (DuPoint). Doc. 31. DuPont attached three particularly relevant documents to its motion: Exhibit 1, the agreement between DuPont and Onyx Industrial Services (Onyx), the Plaintiff's employer, (Exh. 1), Exhibit 3, the deposition of the Plaintiff (Exh. 3), and Exhibit 4, the deposition of Jacinto Meza (Exh. 4). The Plaintiff, Larry Saldana (Saldana), has responded. Doc. 35. To his response, Saldana attached four particularly relevant documents: Exhibit B, specific safety requirements for hydroblasting (Exh. B), Exhibit E, DuPont's form that contractors must complete to permit deviations from standard procedures (Exh. E), Exhibit G, DuPont's "corporate standard" regarding "on-site safety administration of contractor personnel" (Exh. G), and Exhibit L, a deposition of DuPont's corporate representative, Jacek Jarosz (Jarosz) (Exh. L). DuPont replied. Doc. 36.

No admissible evidence establishes that DuPont breached the minimal duty of care that it owed Saldana, its motion for summary judgment is GRANTED. Doc. 35.

**BACKGROUND**

On March 15, 2002, Saldana cut his foot with a high-pressure stream of water while cleaning a piece of equipment at DuPont's manufacturing plant. Saldana now seeks compensation for his injuries from DuPont.

DuPont did not employ Saldana. Instead, DuPont contracted with Onyx to "hydroblast" equipment, clean it with a stream of water as powerful as a 45-caliber bullet. Onyx employed and trained Saldana to hydroblast the funnel on top of DuPont's "lime contactor," a piece of equipment used in the manufacture of chemicals. Saldana sprayed the water to clean the funnel through a 66-inch nozzle called a "shotgun." The shotgun was designed to be placed against the user's shoulders and activated by pressing two triggers simultaneously.

DuPont required Onyx to control the method in which it performed its work and to provide "all labor supervision, materials, tools, equipment … to properly and efficiently do all things necessary to provide Services." Exh. 1, ¶¶1, 19, and 29.

In the contract, Onyx promised, "to provide its services in a careful and workmanlike manner and to take all necessary precautions … to avoid an unhealthy or unsafe work environment [or] injuries to persons" because "hazards may be involved in providing" its services to DuPont. Exh. 1, ¶15. If Onyx operated unsafely, DuPont reserved the right to suspend it. Id.

DuPont incorporated specific safety standards into its contracts, "to help the contractor reduce the number and severity of accidents," "accident related costs," and to, "improve overall effectiveness." Exh. G at 2, §1.1. However, DuPont allowed contractors to enact, "rules and procedures" that "need not be identical to [DuPont's] rules, but should afford an equivalent level of protection." Id at 2, §3.2. DuPont also provided a form that contractors could complete to request deviations from established policies. Exh. E. For hydroblasting, DuPont regulated the type

of shotgun that anyone could use on its property. The "[m]inimum length of the shotgun from butt to nozzle is 66 inches to prevent the jet from striking the body. Any exceptions will be handled by a formal deviation process that includes approval by DuPont." Exh. B at 11, §6.2.2. Also, "[a]ll shotguns shall have a shoulder butt and at least two integral fail-safe valves or contact-type control switches on the shotgun, either of which when released by the operator will immediately interrupt flow to the nozzle. The valves or switches shall be guarded to prevent accidental activation and shall be positioned so that both of the operator's hands are required to initiate and sustain water flow to the nozzle." Exh. B at 11, §6.2.1.

Saldana's experience conformed to these general standards. Onyx provided Saldana with all of his equipment except for an acid suit. Exh. 3 at 60-65. DuPont employees told him what objects he was to hydroblast and how clean DuPont needed them to be, but not how to hydroblast. Id. at 111-12. They neither trained Saldana to hydroblast nor supervised him when he was hydroblasting. Id. at 99. He was left to do his job, but not authorized to move any equipment. Id. at 163. Thus, no DuPont employees were in the vicinity of the contactor at the time of the accident. Id. at 99.

Saldana's deposition provided the only account of the accident. He arrived at DuPont's plant and found the contactor was bolted in an upright position, the position in which it operated. Exh. 4 at 30-31 and Exh. 3 at 140-41. He did not feel safe given how the contactor was positioned because, "the safest way [to hydroblast it] was to put it on the ground." Exh. 3 at 181. Saldana told Steve Doyle, Onyx's senior technician, that he did not think that the contactor should be hydroblasted in a standing position. Id. at 182. However, Doyle told him to do it anyway. Id. at 182-83. No DuPont employee told Saldana to hydroblast the contactor directly. Id. at 183. When he started hydroblasting, Saldana knew he "had to exercise extra precaution [sic] because of the

position that the cone was in" and "tried to do it as safely as [he] possibly could." Id. 180. Thus, "the actual hydrobalsting was done in a safe manner; but as far as the way [his] body was positioned, [he] wasn't comfortable with that." Id. at 182. To reach the funnel he was asked to clean, Saldana had to balance himself on a rail, a task that was "pretty tricky." Id. at 158. He also "had to put … the shotgun over [his] head and place it inside the cone." Id. at 164. He also threw his leg over a rail with his right foot hanging down over a rail using his left leg for balance. Id. at 170-71. Saldana was very clear that his leg was not resting on anything and that he did not bump into anything. Id. 177-78. He "just grabbed the gun … to reposition it." Id. at 178. While repositioning the gun, Saldana left one trigger and accidentally bumped the second trigger, thereby activating the nozzle and cutting his foot. Id. at 178. None of the equipment malfunctioned. Exh. 3 at 179. The platform on which he was standing did not shift. Id. at 179-80. He did not slip. Id. at 180.

After the accident, DuPont reviewed its procedures to improve workers' safety. It determined that a key factor in causing the accident was the failure to release both triggers when repositioning the shotgun. Exh. L at 99. Consequently, DuPont supplemented its procedures to require contractors to release both triggers when repositioning the shotgun. Id. at 101. According to DuPont's designated representative, before Saldana's accident, "there was no explicit statement in either PP-18 or any of the industry standards saying, release both triggers any time the butt is removed off the shoulder" because "it was understood, as a common sense that, since we're specifying two triggers … it will be a common sense way of using this equipment not to bypass the safety features. … I mean, it may be telling somebody, if you have a hammer, don't hit yourself in the head." Exh. L at 100. DuPont also raised the scaffold structure around the contactor to diminish the workers' need to reposition the shotgun. Exh. L at 61-63.

**LEGAL ANALYSIS**

A party seeking summary judgment must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, showing that no genuine issue of material fact exists and explain why it is is entitled to judgment as a matter of law.  Fed. R.Civ. P. 56(c);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party demonstrates both an absence of a material fact and an entitlement to judgment as a matter of law, then the party opposing the motion for summary judgment bears the burden of setting forth specific facts and competent summary judgment evidence that raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial.  Fed. R.Civ. P. 56(c).  The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence and specific facts demonstrating the existence of a genuine issue for trial.  Fed. R.Civ. P. 56(e); *Anderson v. Liberty Lobby*, 477 U.S. 248, 256-57 (1986).  The non-moving party need not present its own evidence, but may identify genuine issues of fact raised by the evidence produced by the moving party to survive summary judgment.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).

In this motion, the parties dispute what duty of care DuPont owed Saldana.  DuPont argues that Texas law immunizes it from Saldana's suit unless its safety regulations actually increased the probability of injuries.  Saldana argues that DuPont cannot avail itself of any immunity because it controlled the way in which Saldana hydroblasted.

Neither party disputes that Saldana was an employee of Onyx or that Onyx was an independent contractor working on DuPont's property.  As a general rule, "[a] property owner is not liable for personal injury, … to … an employee of a contractor … who … repairs [or] renovates … an improvement to real property … arising from the failure to provide a safe workplace[.]"  Civil

Prac. & Rem. Code § 95.003 (§ 95). However, a property owner may lose this statutory immunity if it, "exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports[.]" Id. This condition, "codifies the common-law holding of *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex.1985), which adopted section 414 and accompanying comments of the Restatement (Second) of Torts[.]" *Phillips v. The Dow Chemical Co.,* --- S.W.3d ----, 2005 WL 3180044 (Tex.App.-Houston [1 Dist.] 2005). Therefore, cases decided even before the Legislature enacted § 95 determine whether a property owner may invoke the statutory immunity created by § 95.

In a sense, DuPont's safety standards controlled the manner in which Onyx performed its work. However, Texas law holds that a property owner does not exercise control over the manner in which a contract performs work by requiring contractors to meet safety standards. *Dow Chemical Co. v. Bright,* 89 S.W.3d 602 (Tex. 2002). Thus, "employers can set minimal safety standards without incurring liability," because no court will require a property owner, "to stand idly by while another is injured or killed in order to avoid liability." *Dyall v. Simpson Pasadena Paper Co.,* 152 S.W.3d 688, 702 (Tex.App.-Houston [14 Dist.], 2004) (pet. filed) (citations omitted).

A property owner's immunity dissolves only if its safety standards, "increase the probability of injury." *Hoechst-Celanese Corp. v. Mendez,* 967 S.W.2d 354, 358 (Tex. 1998) (per curiam). This court interprets the analysis in *Hoechst-Celanese Corp.* to mean that only a policy's overall effect determines whether a contractor may recover from a property owner because any safety policy increases the probability of injuries in certain situations, even if it reduces them in all other situations. For example, a seat belt may trap a person in a burning car, yet still prevent far more injuries than it causes. Thus, a plaintiff's case fails if the plaintiff shows only that the safety

regulation merely increases the probability of a particular accident under particular conditions instead of showing that the requirement increases the probability of injuries generally.

This case raises the same issues raised in *Bright* where the injured person argued that the defendant, "had a contractual right to control the premises because [it] required its independent contractors to comply with the safety rules and regulations promulgated [in a] Safety and Loss Prevention Manual." *Bright,* 89 S.W.3d at 607. The Texas Supreme Court rejected this contention because, "[t]o hold otherwise would deter general contractors from setting even minimal safety standards." *Id.* at 607-08. Saldana established that that DuPont, like Dow, imposed extensive safety requirements and reserved the right to stop work for violations of the safety requirements. Because DuPont imposed only safety requirements on Onyx, it, like Dow, did not actually control the manner in which Onyx performed its work, at least as that phrase is understood within § 95.

Because DuPont did not control the manner in which Onyx performed its work, DuPont is immune from Saldana's claim unless admissible evidence creates the possibility that DuPont's safety regulations actually increased the probability of injury. Only Saldana's argument that "[b]ut for the requirement to use a long shotgun, Mr. Saldana would have likely avoided the accident" describes one of DuPont's procedures as having increased the likelihood of Saldana's injury as opposed to simply not reducing the risk of injury sufficiently. Plaintiff's Response at 6. Saldana presented no admissible evidence to support this argument. Likewise, he did not even argue that a shorter shotgun would have reduced the probability of injuries generally.

Saldana's case cannot survive even if *Hoechst-Celanese Corp.* is properly interpreted as requiring a plaintiff to show only that a particular safety regulation increased the probability of a particular kind of injury. As noted previously, any safety procedure or mechanism holds the possibility of actually increasing the probability of certain kinds of injuries. Those who design

safety procedures recognize this problem and often implement supplemental or redundant safety devices. In this case, DuPont required just such a supplemental safety device, the double trigger. If Saldana had disengaged both triggers, then the length of the nozzle would not have caused his injury. Thus, DuPont's requirement that Onyx use a 66" shotgun caused Saldana's injury only because Saldana ignored the other safety mechanisms that DuPont mandated. These requirements cannot be separated into distinct policies because following only parts of any safety regulation can increase the danger. Consequently, it is possible to attribute Saldana's injury to his own failure to disengage both triggers or to Onyx's failure to train him to disengage both triggers. Saldana provided no evidence that the mandated length of the nozzle, in conjunction with the double triggers, increased the probability of an injury. Instead, he argued only that it is not safe to use an otherwise safe piece of equipment improperly.

Of course Saldana's failure to use the double triggers raises another line of questions regarding DuPont's responsibility regarding the double triggers. Is DuPont liable for failing to demand that Saldana disengage both triggers. DuPont now requires hydroblasting contractors to train operators to disengage both triggers when repositioning shotguns. At the time of Saldana's accident, DuPont required Onyx to use a shotgun with double triggers, but did not require Onyx to train its employees to disengage both triggers. At worst, DuPont's policy was deficient because it did not mandate adequate training, even though it required Onyx to use adequate equipment. No evidence suggests that the policy was affirmatively harmful. No safety policy renders a property owner liable to a contractor unless it is affirmatively harmful. Therefore, the potential inadequacy of DuPont's policy does not dissolve DuPont's immunity. If Saldana's arguments are valid, they demonstrate that Onyx, not DuPont, should have trained Saldana to disengage both triggers.

At worst, DuPont asked Onyx to clean a piece of equipment under conditions that rendered the ordinary hydroblasting equipment less safe. Onyx chose to accept the risk and forced Saldana to chose between his safety and his job. Thus, Onyx, not DuPont, carries the blame for Saldana's injury. DuPont required Onyx to provide all labor supervision. Exh. 1, 2. If Onyx had determined that a 66" shotgun was unsafe in a confined space, it could have explained its position to DuPont and adopted an equivalent procedure. Exh. G at 2, § 3.2. DuPont even provided a specific mechanism and form by which Onyx could request such a variation. Exh. E. Arguably, Onyx accepted the duty to evaluate the safety of every situation and request deviations when DuPont's requirements rendered a particular situation unsafe because it agreed, "to avoid an … unsafe work environment [or] injuries to persons[.]" Exh. 1, ¶15. Even more telling, in the sentence immediately following the requirement of a 66" nozzle, the Onyx's manual states, "[a]ny exceptions will be handled by a formal deviation process that includes approval by DuPont," apparently contemplating the need for a shorter nozzle in certain situations and accepting responsibility for identifying those situations. Exh. B at 11, §6.2.2. Thus, Onyx, not DuPont, was responsible for Saldana's safety.

Accordingly the Defendant's Motion for Summary Judgment is GRANTED. Doc. 31.

SIGNED at Houston, Texas, this 31st day of January, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE